In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-8003

MOTOROLA MOBILITY LLC,

*Plaintiff-Appellant,*

*v.*

AU OPTRONICS CORP., *et al.,*

*Defendants-Appellees.*

Petition for Leave to Take an Interlocutory Appeal from the
United States District Court for the Northern District of Illinois,
Eastern Division.
No. 09 C 6610 — **Joan B. Gottschall**, *Judge.*

SUBMITTED MARCH 13, 2014 — DECIDED MARCH 27, 2014

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* This case is before us on the plaintiff's unopposed petition for leave to take an interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), from an order that the district judge has certified for an immediate appeal. We grant the petition for reasons explained below; and because the petition and the defendants' response, together with the district judge's opinion explaining her order and the record in the district court, provide an ample basis for deciding the

appeal, we dispense with further briefing and with oral argument.

Motorola and its foreign subsidiaries buy liquid-crystal display (LCD) panels and incorporate them into cellphones manufactured by either the parent or the subsidiaries. The suit accuses several foreign manufacturers of the panels of having violated section 1 of the Sherman Act, 15 U.S.C. § 1, by agreeing on the prices to charge for them. Only about 1 percent of the panels were bought by, and delivered to, Motorola in the United States; the other 99 percent were bought by, paid for, and delivered to its foreign subsidiaries (mainly Chinese and Singaporean). Forty-two percent of all the panels were bought by the subsidiaries and incorporated by them into products that were then shipped to Motorola in the United States for resale by Motorola (which did none of the manufacturing). Another 57 percent of the panels were also bought by the subsidiaries, but were incorporated into products that were sold abroad as well (42 percent plus 57 percent plus 1 percent equals 100 percent of the allegedly price-fixed panels). The 57 percent never entered the United States, so never became domestic commerce. See 15 U.S.C. §§ 6a, 6a(1)(A). And so, as we're about to see, they can't possibly support the Sherman Act claim.

Motorola says that it "purchased over $5 billion worth of LCD panels from cartel members [i.e., the defendants] for use in its mobile devices." That is incorrect. All but 1 percent of the purchases were made by Motorola's foreign subsidiaries, which are not plaintiffs in this litigation.

In response to a motion for partial summary judgment by the defendants, the district judge ruled that Motorola's claim regarding the 42 percent (plus the 57 percent, but we'll ig-

nore that, as a frivolous element of Motorola's claim) is barred by 15 U.S.C. § 6a(1)(A), a provision of the Foreign Trade Antitrust Improvements Act that says that the Sherman Act (only section 1 of that Act, but to simplify our opinion we'll now drop that qualification) "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless such conduct has a direct, substantial, and reasonably foreseeable effect on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations," and also, in either case, unless the "effect gives rise to a claim" under federal antitrust law. See, e.g., *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161–62 (2004); *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 853–54 (7th Cir. 2012) (en banc).

We agree with the district judge and the parties that in the language of section 1292(b) the judge's order presents "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Motorola's antitrust suit against the defendants, now in its fifth year, is a complicated affair. If 99 percent of the transactions on which the suit is based can be eliminated from the litigation at a stroke (the 42 percent at issue in this appeal plus the 57 percent clearly barred by the Foreign Trade Antitrust Improvements Act from challenge under the Sherman Act) before the litigation moves into high gear, there will be a considerable economy. Although as we're about to explain we think the district judge's ruling correct, there is room for a difference of opinion, as evidenced by the fact that the judge presiding at the multidistrict-litigation phase of the proceeding had ruled

for Motorola on the issue of the Sherman Act's applicability to the 42 percent. So, as in *Minn-Chem, Inc. v. Agrium, Inc., supra*, 683 F.3d at 848, which also involved an interlocutory appeal presenting issues under the Foreign Trade Antitrust Improvements Act, Motorola's appeal is properly before us and we proceed to the merits.

If the defendants conspired to sell LCD panels to Motorola in the United States at inflated prices, they would be subject to the Sherman Act because of the foreign trade act's exception for importing. That is the 1 percent, which is not involved in the appeal. Regarding the 42 percent, Motorola must show that the defendants' price fixing of the panels that they sold abroad and that became components of cellphones imported by Motorola had "a direct, substantial, and reasonably foreseeable effect" on commerce within the United States. There was (assuming price fixing is proved) doubtless *some* effect; and it was foreseen by the defendants if they knew that Motorola's foreign subsidiaries intended to incorporate some of the panels into products that they would sell to Motorola in the United States. And who knows what "substantial" means in this context? But what is missing from Motorola's case is a "direct" effect. The effect is indirect—or "remote," the term used in *Minn-Chem, Inc. v. Agrium, Inc., supra*, 683 F.3d at 856–57, to denote the kind of effect that the statutory requirement of directness excludes.

The alleged price fixers are not selling the panels in the United States. They are selling them abroad to foreign companies (the Motorola subsidiaries) that incorporate them into products that are then exported to the United States for resale by the parent. The effect of component price fixing on the price of the product of which it is a component is

indirect, compared to the situation in *Minn-Chem*, where "foreign sellers allegedly created a cartel, took steps outside the United States to drive the price up of a product that is wanted in the United States, and then (after succeeding in doing so) *sold that product to U.S. customers*." *Id*. at 860 (emphasis added). It is closer to the situation in which we said the foreign trade act would block liability under the Sherman Act: the "situation in which action in a foreign country filters through many layers and finally causes a few ripples in the United States." *Id*.

Motorola contends, and at this stage in the litigation we must assume the truth of the contention, that it determined what the subsidiaries paid for the LCD panels. It must have thought the price okay, or it wouldn't have let the subsidiaries pay it. It may or may not have known that it was a cartel price. But we cannot see what difference any of this makes. Suppose Motorola had bought the panels from the defendants outright, then resold the panels to its foreign subsidiaries, which used them in manufacturing cellphones that they then exported to the United States. The effect on prices in the United States would be the same as if the foreign subsidiaries had negotiated the price charged by the alleged cartel to Motorola, because the price would be the same—it would be the cartel price. And so the (indirect) effect on U.S. domestic commerce (the sale of the cellphones in the United States) would be the same.

Motorola's claim is upended by another—and independent—requirement that must be satisfied for the statutory exemption in 15 U.S.C. § 6a(1)(A) to apply: the "effect" of the defendants' practice on domestic U.S. commerce must "give[] rise to" an antitrust claim. The effect

of the alleged price fixing on that commerce in this case is mediated by Motorola's decision on what price to charge U.S. consumers for the cellphones manufactured abroad that are alleged to have contained a price-fixed component. No one supposes that Motorola could be sued by its U.S. customers for an antitrust offense merely because the prices it charges for devices that include such components may be higher than they would be were it not for the price fixing. (We say may be, not would be, because Motorola's ability to pass on the higher price to consumers would depend on competition from other cellphones and on consumer demand for cellphones.) So the effect in the United States of the price fixing could not give rise to an antitrust claim. Motorola's claim against the defendants is based not on any illegality in the prices Motorola charges (in which event Motorola would be suing itself, as in William Gaddis's novel satirizing law, *A Frolic of His Own* (1994)), but rather on the effect of the alleged price fixing on Motorola's foreign subsidiaries. See *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, *supra*, 542 U.S. at 173–74. And as we said in the *Minn-Chem* case, "U.S. antitrust laws are not to be used for injury to foreign customers." 683 F.3d at 858. The subsidiaries are "foreign customers," being fully subject to the laws of the countries in which they are incorporated and operate—and "a corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties." *Disenos Artisticos E Industriales, S.A. v. Costco Wholesale Corp.*, 97 F.3d 377, 380 (9th Cir. 1996).

Furthermore, derivative injury rarely gives rise to a claim under antitrust law, especially a claim by the owner of or an

investor in the company that sustained the direct injury. *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1335–36 (7th Cir. 1989). Such a claim would be redundant, because if the direct victim received full compensation there would be no injury to the owner or investor—he or it would be as well off as if the antitrust violation had never occurred. If Motorola's foreign subsidiaries have been injured by violations of the antitrust laws in the countries in which they do business, they have remedies; if the remedies are inadequate, or if the countries don't have or don't enforce antitrust laws, these were risks that the subsidiaries (and hence Motorola) assumed by deciding to do business in those countries. What they didn't have if they overpaid was a claim under the Sherman Act; no more does their parent.

But we don't want to rest our decision entirely on the statutory language (the requirement of a "direct effect" on domestic commerce and the separate requirement that that "effect" give rise to a Sherman Act claim), without considering the practical stakes in the expansive interpretation urged by Motorola. The stakes are large and cut strongly against its position. Nothing is more common nowadays than for products imported to the United States to include components that the producers had bought from foreign manufacturers. See Gregory Tassey, "Competing in Advanced Manufacturing: The Need for Improved Growth Models and Policies," *Journal of Economic Perspectives*, vol. 28, no. 1, p. 27, 31–35 (Winter 2014); Dick K. Nanto, "Globalized Supply Chains and U.S. Policy" 4–10 (Congressional Research Service, CRS Report for Congress, Jan. 27, 2010), http://assets.opencrs.com/rpts/R40167_20100127.pdf (visited March 26, 2014). Motorola itself acknowledges "that a sub-

stantial percentage of U.S. manufacturers utilize global supply chains and foreign subsidiaries to effectively compete in the global economy." Many foreign manufacturers are located in countries that do not have or, more commonly, do not enforce antitrust laws, or whose antitrust laws are far more lenient than ours, especially when it comes to remedies. As a result, the prices of many products exported to the United States are elevated to some extent by price fixing or other anticompetitive acts that would be forbidden by the Sherman Act if committed in the United States. Motorola argues that "the district court's ruling would allow foreign cartelists to come to the United States" and "unfairly overcharge U.S. manufacturers." Not true; the defendants did not sell in the United States and, if they were overcharging, they were overcharging other foreign manufacturers— the Motorola subsidiaries.

The Supreme Court has warned that rampant extraterritorial application of U.S. law "creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, *supra*, 542 U.S. at 165. The Foreign Trade Antitrust Improvements Act was intended to prevent such "unreasonable interference with the sovereign authority of other nations." *Id*. at 164. The position for which Motorola contends would if adopted enormously increase the global reach of the Sherman Act, creating friction with many foreign countries and "resent[ment at] the apparent effort of the United States to act as the world's competition police officer," a primary concern motivating the foreign trade act. *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 960–62 (7th Cir. 2003) (en banc) (dissenting opinion), over-

ruled on other grounds by *Minn-Chem, Inc. v. Agrium, Inc.*, *supra*. It is a concern to which Motorola is oblivious.

AFFIRMED.